versus Tata TCS. I'm curious to know how you abbreviate it. Mr. Bash? Thank you, Judge Higginson, and may it please the Court. We say TCS, the other side says Tata, but it's the same thing. We ask that this Court reverse the judgment for trade secret misappropriation below, principally on the ground that all of the activities that the District Court found that TCS engaged in were authorized by contract. Now, there are two sets of contracts relevant here. The first are the contracts between the plaintiff, CSC, and the party's mutual client, Transamerica. That's principally the third-party addendum from 2014. The District Court held that that contract did not authorize the sharing that happened here or the use from the sharing that happened here. Because TCS received more than an ordinary pecuniary benefit, we think that's wrong and it has no basis in the text of the agreement. I'll come back to that in a second. The other set of contracts that are relevant are the contracts between my client, TCS, and the mutual client of the two entities, Transamerica. Those are Service Agreements 75, 2, and 4. Let me just say one – 2018 Service Agreements. Correct. 75 was in 2017 during the bid process. But let me just take one of those, Service Agreement 2, because that's the one that required us to customize our product called Banks for Transamerica's Needs. One, that agreement in Schedule C – that's at page 55592 of the record – lists a whole set of very specific tasks that we need to do to customize this off-the-shelf, if you will, product for Transamerica's needs. Two, the Master Services Agreement that that links into says, in a schedule to each of these Service Agreements, we will list the software you need access to to perform these tasks. This is going to mens rea, because there are no contracts between TSC and CSFC, right? There are no contracts between the two. The Service Agreements we're talking to now go to both Contractual Authorization and mens rea. The way they link into Contractual Authorization is we need both. So we need the third-party addendum to have authorized this sort of sharing. So the Service Agreements piggyback on the third-party addendum. So I think most of the trial argument, the defense, closing, everything was focused on the third-party addendum. So that's – and it seemed to me that was really the argument that was primarily made. So let me turn to that then, Judge Higginson, with the Court's leave. So what the – the third-party addendum says this. There are certain authorized service providers identified in Section 2. I think it is undisputed at this point that under 2 sub 4, we are an authorized service provider, just – it cross-references an exhibit that lists us. So we're just in on that. Section 3, which is really the heart of this case, authorizes Transamerica to either extend or authorize – and I think that disjunctive phrasing is key, which I'll come back to – extend or authorize certain rights to an authorized service provider. In this case, the District Court's findings in the order identified two rights that we exercised with respect to CSC's source code and documentation. Access and use. If you go through the opinion, it's all access and use. The District Court did not, for example, find that we created a derivative work, which would be governed by a different subsection. Under subsection 3A, as long as our access and use of CSC software is solely on behalf of and for the benefit of Transamerica, then it is authorized. And then there's another limitation. Just because time's short, although we can extend it. Factually, the witnesses and exhibits – push back on this if I'm wrong – repeatedly did say there were efforts to segregate. There were efforts to just retain use necessarily to improving the functionality of Vantage and CyberLife. But then there was testimony from people like Frieden and SETI that said segregation didn't work, and the use spilled over to the teams that were developed, the non-rebadged employees that were developing banks. So if that's true, does your argument have to be that even work on banks by non-rebadged employees, the third-party addendum allowed them to use it, to develop a competing product, not just functionality of the existing? Not quite, Judge Higginson. Here's the distinction. Maybe some of that testimony, but the snippets of emails and things in the record that they're talking about often refer to banks generally without distinguishing what we call the customer layer, but if you don't let that turn out… So it turns on – so the SETI email and then the eventual red flag email, you probably know those by plaintiff's numbers, right? 336, 228. Correct. There's a snapshot, if I remember in one of them, of the manual, CSC's manual, but they omit the proprietary information. How is that not infringing unless it only ends up at the customer level and there was no conflicting fact issue for the jury to decide about whether it bled into the whole product? So it was an advisory jury, just to be clear. Yes, I understand that. There is no finding by the judge in this case that any CSC information ever wound up in aspects of banks that could be marketed to other clients. In other words, not the customized features of banks. If you look through those findings, they highlight a couple sentences where he just says, banks generally. There's no finding that any of this CSC information was in a part of banks that's marketable to other customers. There's no finding that my client ever planned to use CSC information. Their liability expert, a guy named Pinto, did not find that any of this information was in the source code for banks. But Pinto said 23 non-rebadged employees got it, and Mr. Ivory in closing said that was just a mistake. We believe that non-rebadged employees who are working on the customer layer, really, as a matter of fact. That's what it comes down to. Well, let me just say it like this. Yes. There's nothing in the contracts that said which employees could get it. Our reading of the contracts is that this information could be used for certain purposes, namely to fulfill these contracts with Transamerica and not for other purposes. Now, I think as a prophylactic matter, our client attempted some segregation to make sure that people working on what I'll colloquially call core banks did not get this information, whereas the people working on the customization of banks did. And I think some of the snippets that they pull from the record of e-mails that says, hey, don't get it. Do you know the snapshot e-mail that I'm talking about? Or SETI photographs? Those were manuals as to software and Vantage. And then the final one, the red flag that led to the lawsuit, did include rate of return for Vantage. But there's nothing in the contracts that prevented that. It may be that as a prophylactic matter, TCS employees, who, by the way, it's undisputed, were unfamiliar with the legal authorizations at issue in this case, were trying to make sure they kept it segregated to avoid any spillover. But there's nothing in the contracts that said any TCS employee couldn't get it. Okay. So that is the position. Then we're back to is the conclusion of law 19, which is they could have used it for any development, even banks, because that's still for Transamerica's benefit? Is that the ultimate argument? Well, as Judge Higgins said, it has to be solely for Transamerica's benefit.  So when you say any development for banks Right. But then the district court in paragraph 349 of its findings said, here are the three reasons it wasn't solely their benefit. One, you save time, you save money. Two, you get $2 billion from them. And three, they've got a witness, Talcadar, am I pronouncing his name right? Talcadar, I think. Talcadar. Final cross-examination question, he said he did use the knowledge for other projects. So Yes. I mean, I may be wrong. Push back on any of those. I don't remember that third finding from the district court. No, no, it wasn't. Good point. It wasn't. I don't think the district court actually found we ever used this knowledge for any other product. But didn't, wasn't the evidence elicited? I don't recall that, Judge Higgins. I'm sorry. I'm sorry on that testimony. But I don't believe there was an actual finding on that, that we've ever used it for another product. I don't think we've actually, at least as a matter of the trial record, actually sold another product in the U.S. So I don't see how we could have used it for another product. Let me take each of your Yes. Because I think you otherwise hit on the core points of the district court's holding. Yeah. One, everybody agrees looking at this contract, it can't be that any benefit to the service provider doesn't count. So the example we give in our brief is a lawyer entering into an engagement letter with a client. They say, I will only use your information, your confidential information for your benefit. Obviously, that doesn't mean to exclude fees to the lawyer from the representation. It also doesn't mean to exclude professional benefits, like you're taking on this big case in a new area for the first time, and you're going to increase your stature. Clearly, that's not what's meant in the engagement letter example. And I think the bid is the same way. What about the language? I mean, you rely, if we can get there, and you'll have plenty of time. Sure. When we get to damages and Sintel. Yep. In Sintel, there is that statement like, no one would ever agree to allow use to be used to compete against one's own product. Well, there's no question, Judge Higginson, this is an unusual contract. I mean, we give you the examples in the text. This is the guy who negotiated, or was at least a part of the negotiations of this contract for CSC. This is at 5-3-3-0-8 of the record. It's about two years after the contract is signed. And he says, this was commercial ransom. They hated us, and we were trying to keep them, and so they gave us commercial ransom. Oh, Manfield. Yes, he said you had four. That's not Manfield. It's Minifield, the vice president, who did say, unconditional and open use. This is the account executive, but he said, he said, unconditional and open use. Well, the name will come to me in a second. But then two months later, a higher level executive in December 16, and this is at page 5-3-0-4-2 of the record, says, this basically imposes no restrictions on TCS. So, in a sense, yes, this is an unusual contract. But then people like, what's her name, you'll know the name, Canfield, and Blazek, both did testify, we didn't think they could use it on banks. Again, I think, Judge Higginson, that that is, I know you're not doing this, but I think that argument is exploiting an ambiguity in the word banks, whether you're talking about the customization of banks or the core product. And the proof is in Service Agreement 2. I mean, as I said, Service Agreement 2, Schedule C, identifies a host of customization of banks, like, like, hundreds of tasks of banks. It's 55592 of the record. And then says, it is necessary for us to access the source code of CyberLife and Vantage to perform these tasks. So, reading comments like that, in light of clear authorization, I think there's only two conclusions. Either that employee was not familiar with the contract, or they're referring to banks, the components of it that could be marketed to others, not the customized features. And I just want to reiterate, there is no finding here that we used it for anything more than the customized features. There's a couple findings that sort of, like, generally refer to banks. There's no specific finding that we used it for the U.S. layer. Is it inconsistent to say sole benefit for TransAmerica if TransAmerica witnesses are saying they didn't want it used for banks' development? They only wanted it for functionality of Vantage and CyberLife? Do you see what I'm saying? You know, I don't know that, like, you know, a decade later testimony by employees changes the meaning of the contract. But again, I'd go, I know I sound like a broken record. No, no, I see. I'd go to Service Agreement 2. Like, that's the actual contract we had. And it said it's necessary for you to use this source code. And you adverted to Men's Rea earlier. I know that's not the issue we've been discussing. But, I mean, put yourself in our position. This is not a fly-by-night operation, TransAmerica. This is a major insurance company. They have the obligation under 9.5 and 10.2 of the Master Services Agreement to get the consents. They give us all the documents. They say in Service Agreement 2, it's necessary for you to access the source code to perform this customization, and then in Service Agreement 4, the migration. We get all that. Then, and, you know, I think this is a key fact, in May of 2019, so after this suit is filed, at a time when TransAmerica has every incentive in the world to say, whoa, we didn't authorize any of this stuff, and this is at page 5, like 54501 of the record, their general counsel's office sends a letter to our general counsel's office saying, you're not allowed to use this for the customer layer unless specifically authorized. So they're still keeping open that we can use this for the customer layer, and of course, as I mentioned earlier, Schedule C of Service Agreement 2 has like dozens of specific authorizations for which TransAmerica has told us it is necessary that we access the source code to perform those tasks. So as a matter of, I think, knowledge, but certainly as a matter of whether we acted willfully and maliciously, which I take to be reserved for blatant theft and hacking and paying the other company's employees to secretly purloin stuff, like in the Motorola case, as a matter of willful and malicious, and then I think even another step, as a matter of the reprehensibility factor, even if you get past willful and malicious for maximum punitive damages of $110 million in this case, this is not close to that. We entered into a contract with a real company that told us we could do this, that gave us the documents, and you know, I don't think you get past knowledge on that record, but even as a matter of clear air review, I certainly don't think you get to willful, malicious misconduct. You look  And I'm just going to say, why don't we add two minutes to each side, because we do have some—at least I have a few questions on damages. Am I into my five minutes? I didn't even notice I'm into my five minutes. No, no, no. You still have a—there we go. Now you've got a little more, and you'll keep your rebuttal. But you just began to talk about, I think, the evidence in terms of Sienter, contract interpretation, willfulness we've discussed. We haven't discussed specificity, and then we haven't discussed damages. So specificity, the level of specificity that the district court held, and I think was trying to construe this Court's precedence, was calculations, business rules, and three other categories. I mean, if that's what satisfies the specificity requirement, there's really not a specificity requirement. I mean, that— But you accepted Globe Ranger below. You didn't say it wasn't binding. I don't know. I do not believe we said it wasn't binding below. Of course, I—the Court can correct me if I'm wrong, but I don't feel like that's a waiver. To me, that's just a different legal argument for, you know, why the specificity was added. We certainly fully preserved the argument that this wasn't specific enough. When I read your expert's testimony, it seemed like he was pretty comfortable looking at the five different categories, understanding manuals versus calculations. And then I thought at the district court level, you said at least the 116 exemplars they have, those are specific enough. Well, the 116 exemplars at the summary judgment stage were specific enough. I mean, I don't know that all of that made it into the trial record, but at minimum, I think there would have to be a recalculation of damages if the Court were to say, well, it's only those 116. All of the other—I'm speaking outside of record, I think, but I think there's like thousands of calculations in these products. Like, if all of those were not necessarily trade secrets, I don't see how, you know, the damages calculation, which tried to figure out how much would it have cost to develop all this, is sufficient. The last thing I would—the last thing I would say about—it's time keeps shifting, so I'm not sure what's going on. Okay. You've got a minute and 45 seconds. Yeah. The last thing, you know, I would say about specificity is, you know, the standard that I think other circuits have adopted under the DTSA is, does this level of description or this level of generality or specificity allow you to identify what's in the public domain and what's actually secret? I think that's essentially the rule of thumb of other circuits. And calculations doesn't do this. If they had listed thousands of calculations and part of the trial had been about whether those calculations were trade secrets, we could have said, our expert says 200 of these are in the public domain already. But they didn't have that burden. It wasn't litigated that way because we lost this issue at summary judgment. And, you know, looking at Globe Ranger, I mean, Judge Costa's opinion for the court basically said, I can't find anything in Texas law that really addresses this one way or the other. This seems fine. I mean, it wasn't exactly a full-throated analysis. It is a precedent of this court, but, of course, it's a precedent on Texas law. I don't think that should govern the DTSA issue in this court. So what's the Sintel double, duplicative windfall argument? So Sintel says this. The DTSA establishes different categories of remedies. The first is lost profits. You get that. They didn't try to prove that here, so that's out. They did in Sintel. It's not here. The second is unjust enrichment beyond the lost profits. And what Sintel says is, at least where you have an injunction, the unjust enrichment that the primary unjust enrichment that the trade secret infringer got was the trade secret. That's one way to think about it. The injunction returns the trade secret. So here we didn't get a chance to market it. We didn't publicly disclose it. The injunction essentially returns the trade secret to the trade secret holder. So once that's been returned, well, what's the basis for further unjust enrichment damages if there hasn't been some separate injury to the trade secret holder that's distinct from lost profits and that's not remedied by getting the injunction? You had to disgorge $56 million equivalent of your use of the trade secrets. You're saying then we get to use the virgins we've got. We've paid for it. Is that it? Correct. So it's sort of like, it can't be both an injunction and we have to pay as if we created it. We can solve this by modifying the injunction. But what we've asked, Judge Ho, that is one way to solve it. What we've asked, because we've already been complying with the injunction, for example, remove CSC information from our servers that we would not have had to do if the injunction had not been enforced, we'd ask for the damages to be removed at this point in the proceedings. We did ask for the injunction not to be issued on the basis that it was duplicative below. We think it's fairer to deal with the damages side since we've already gone a long ways to comply with the injunction. You're saying due to the time passage from one court to the other, it's sort of too late to unscramble the egg, is it? Correct. That is our argument. Not too late. That's a fair characterization of our argument. It's costly to unscramble the egg. But couldn't the damages be, the unjust enrichment damages be forepassed? You lifted the trade secrets to develop the bank system that helped you in this $2.6 billion contract with Transamerica past conduct. And injunctive relief is prospective looking. You're not going to use this trade secret to go out into the marketplace and compete wherever else by basically benefiting with it. In other words, you can't just get by paying a royalty, so to speak, in terms of the unjust enrichment, and then go forth and do what you want to do. Judge Wilson, I think if they could have proven that we won the contract because of the alleged trade secret infringement, then they could have, that would have been lost profits. I mean, they could have established, you know, you got the contract, we didn't, lost profits. But what Not so much that. It's that TCS saved $56 million in development costs that go straight to its profits, the bottom line in that contract, when it otherwise would have had to expend that development effort. But if that's our unjust enrichment, that like it would have taken us $56 million worth of expenditures to develop this, then it's not clear why there should be an injunction. I mean, that's what that The injunction is forward looking. You can't use the benefits of what you stole going forward beyond this project, beyond this contract. I understand the point. I guess the way I would think about it is that at that point going forward, once we pay the $56 million of what it would have cost us to develop this, that actually isn't unjust enrichment at that point. We're not further enriched because now we've paid the full cost of what it would have cost us to independently develop this. It feels like you get, you get by with a royalty and CSC wasn't selling its trade secret. So you kind of get around the fact that they had a trade secret, right? Well, I don't And I'm struggling to see the duplication between the relief ordered, the damages relief as well as the injunctive relief. I think they're distinct. Well, you know, I think if the damages had been confined to some measure over a specific period, that would be true. But the damages were our full cost to independently develop this, at which point we could have used it in perpetuity. So at least to our way of thinking, that covers use of the trade secrets in perpetuity because we paid what it would have cost to develop them. What's the harm of saying now you can develop it your own self now without stealing it? Well, if we then had to separately develop it, it's unclear why we had to pay $56 million in unjust enrichment damages because now we're going to have to incur those costs by virtue of the injunction to redevelop them. So I mean, that is our argument of why it's duplicative. Thank you. Thank you, Judge. Is there a rebuttal time? You've got the extra two minutes, too. Thank you, Your Honor. Appreciate it. May it please the Court. As I think was conceded by counsel for TCS, we also call it TATA actually. In this case, with TATA, a repeat violator of trade secret law, is asking this Court to do is to bless all of the conduct that the District Court found in its 143 pages of findings of fact and conclusions of law on the grounds that CSC authorized every bit of it. That is, that CSC authorized TATA, its competitor, to use CSC's valuable trade secrets for free to, one, bid against CSC and ultimately win a $2.6 billion contract. Two, develop a software platform that TATA intended to use, and I'll cover that, the finding of fact that covers that, intended to use and could, but for the injunction in this case, use to market against CSC. And three, to displace CSC at Transamerica. That absurd reading or absurd position simply has no basis and is precluded both by the plain language of the governing contracts and the Court's findings of fact. So with my time, I'd like to begin and stay with misappropriation subject to any questions you all have or different directions you want to go to. I'll start with misappropriation, which I've been talking about. Then I'll talk about remedies. Then I'll try and talk about trade secret identification. And to the extent that there's time left, I'll talk about mens rea. Mr. Ivory said, you know, all the evidence shows is they came in to do find and fix for your functionality. To the extent it bled over into banks, the development of banks to displace you in the bidding, it stayed at the customer level, which Transamerica owned always. Therefore, no theft. A deal is a deal. Yes. So that's exactly where I want to go, which is the findings of fact and the underlying evidence do not support that. So there is no less than eight different times finding of fact 220, 349, 420, 426, 428, 441, 446, and 533, where the district court found that Tata used CSE's trade secrets to develop banks, period. Not to develop the so-called customer layer of banks, to develop banks. You threw out a lot. I don't remember those specifically. I have a pretty good grasp of the trial records. So you heard me mention both the red flag e-mail and then the SETI e-mail with the snapshot. Those two, do you recall those? Those are not in the I wills. No, I know. I guess, I mean, those two, which were heavily emphasized at trial, did those go to people only working on the customer level? Absolutely not. Absolutely not. No, they did not. They went to people like Deepan Talakdar and they went to Arindam Paul. They went to other people. And frankly, Your Honor, we don't All the findings of fact you cited to us, plus the two incidents that I described, did not stay at the customer level, even if we accept, and I know it was disputed, that that's trans-American property or that there even was that line of segregation. Well, the way I would answer it is there is no finding of fact that it stayed at the customer level. To the contrary, the district court found that it was used to develop banks. And they were clear what they peddled, what they argued throughout the trial and also in their post-trial briefing, is no, no, we use it all and only to develop the trans-America level, which, by the way, the district court found doesn't even exist. They made it clear The district court made a finding that the customer level doesn't exist as a layered structure? Yes. It does? Do you remember the fact Based on Paul Pinto's testimony, it is close. I don't Though this really does push us, I think this is probably where you're going. One could argue that the whole banks chess project was still exclusively benefiting trans-America because the district court made no finding of fact that it was ever used to market to another person. Do you see where I'm going with that question? That seems to be sort of the essence of the issue. That is the essence of their argument, but that is not what the district court found. In fact, the district court found that at finding of fact 26, that TCS believed that landing trans-America as an anchor client would create an opportunity to adapt banks for the U.S. market. Finding of fact 579, in misappropriating the trade secrets, TCS avoided years, if not decades, of development of and significant investment in banks. And then perhaps most directly to what your honor asked about, finding of fact 584, banks was built to displace Vantage and CyberLife at trans-America and in the U.S. market. Okay, so number 26 and 584, can you remember witnesses that backed up those findings of fact? I'm sure the footnotes, I'll look at the footnotes, because the district court was pretty responsible that way, but does it come to your offhand? Who said that? Because I quoted the final cross-examination question of Talakdar, but... Right, so Mr. Talakdar, I did question him about that. You did, you're the questioner? Yes, and he said... You remember that as the last question? Yes, and he said, I don't know if it was the last question, your honor, but he did say that he personally had previously had no experience working in the U.S. market, and through this, through using CCC's trade secrets, he gained invaluable experience that he could use for other purposes and for other clients, and so that is certainly not solely for the benefit of or on behalf of Transamerica. Also, it's important, what's an important thing is... Well, I guess, you remember, I mean, when he says, oh, well, we do get into a little bit of difficult, at least from my brain, conceptually distinguishing, okay, they could benefit in terms of compensation to improve the functionality, but they couldn't benefit they being your client, I mean, CTCS. They couldn't benefit a lot, i.e. two billion. You see... Well, I don't think it's that, your honor. It's that they could not go and use CCC's trade secrets to build a competing software product that it would then use to actually service under a $2.6 billion contract, but for which it wouldn't have been able to service, and also that it could then, it would own the software because, importantly, finding a fact 351, the court correctly found that TCS retains full ownership of TCS banks, including any customer layer. So, TCS owns this. That's what the court found correctly under its interpretation of the contract and based on the testimony of TATA executives who said that TCS owns banks, and because of that, it's not, their use of banks is not limited to Transamerica. They can go market it, but for the injunction, and use it anywhere they want to. The jury heard Vice President Menehan's statement? Menehan? Menehan. Menehan, is that his name? The guy who said, you know, we were the source of all evil, and therefore we were in a difficult spot, we had to give up use rights unconditionally, open-endedly. Oh, I understand who you're talking about now, the CSE employee. He did not, I don't believe he testified, I don't remember. It's the email that he wrote. But certainly, there is an email, so let me address the email. The first thing is, it's parole evidence, so it's, his interpretation of the TPAA is irrelevant. Second of all though, they mischaracterized his position in their briefs. In their briefs, they say that he was the person who negotiated the contract. There's record evidence that that is not the case. One of our witnesses, whose name of course I'm not blanking on, in fact testified that he likely was not the person, would not have been in the position to negotiate the TPAA. But most importantly, if you look at that email, what he says is, we've given them open-ended and unconditional access. He was not saying through that language that now TCS can use our valuable trade secrets to build a product to displace us. All he was saying is open-ended, meaning there's no end period on this. We haven't said for five years, for 10 years, for 15 years. And with this, and so many other things that Mr. Bash talked about, and that is talked about in Tata's papers, it's, they're just trying to weigh the evidence differently. They're asking you to reach different inferences than the jury did, to reach different, essentially to weigh the evidence differently. And under the standard of review that we're under here, that's inappropriate. And so the district court correctly found, disregarded that email and said it doesn't contradict either the plain language of the TPAA. And it doesn't even mean what Tata is saying that it means. Quick question about the TPAA, and tell me if this is oversimplifying, but is the argument essentially solely for the benefit of Transamerica, it's implicit that that means solely for the benefit of Transamerica pursuant to this contract? Pursuant to this contract, yes.  Yes. Under, right, right. Yes, and under the underlying contracts. Right, as opposed to benefiting Transamerica in lots of other ways outside this contract. Correct, exactly, yes. The other thing that I want to touch upon with respect to misappropriation is the Section 3A issue and how that interprets Section 3A, because most of what Tata's focus on at the district court, and then also here before you, is this interpretation of solely for the benefit of Transamerica. And as we've described, building a competing software platform that you can market elsewhere is not solely for the benefit of Transamerica. But, frankly, you don't, if you don't want to, you don't even have to get to that issue. And the reason for that is 3A restricts Tata's access and use of CSC's trade secrets to the same extent that Transamerica can use it. And how does it do that? It says that Tata may access, copy, execute, and use the software and all, this is the key word, other rights. All other rights granted to licensee, which is Transamerica, under the Vantage and Cyberlife Agreement. So they can do four things. This is in the February 2014? Yes, this is in the TPA. Okay. Which is the key contract, in our opinion. And this is 3A. And what they've said is, Section 3A, their access and use is not limited to the same extent as Transamerica's access and use. That is, they can use our software more than Transamerica can. And the plain language of Section 3A simply doesn't support that. And again, the reason is, it says they can do four things, and then says, and all other rights granted to licensee under the Vantage and Cyberlife Agreements. The word under means further or additional. And so that word there clearly makes it clear that the access, copy, execute, and use rights are only the access, copy, execute, and use rights granted to Transamerica. Let me give you a simple analogy. If I talked to one of my non-lawyer friends, and I said, I'm inviting Judge Higginson, Judge Ho, Judge Wilson, and all Fifth Circuit judges to my house. My non-lawyer friend would not know whether or not you were Fifth Circuit judges based on what I told him. But, if I said, I'm going to invite Judges Higginson, Ho, Wilson, and all other Fifth Circuit judges to my house. The use of the word other there makes it clear to any reasonable reader, or listener, that you are Fifth Circuit judges. So too here. The use of the word other in Section 3A clearly limits the rights granted to TATA to the rights that are granted to the licensee, Transamerica. And why does TATA run from this so much? Why do they spend so little time on it? The reason for that is that it's undisputed, or it at least should be undisputed, that Transamerica could not use CSC's trade secrets to build a software platform that it then uses and kicks CSC out, and says, thank you very much. We don't need to pay you license fees. All we did was we copied your software. We used your trade secrets. Which conclusion of law does this pertain to? When did the District Court make this conclusion? It doesn't, Your Honor. It's an alternative basis. This Court can affirm on any grounds, and it's an alternative basis. We don't, I'm not saying you need to get there. Just because of time, do you want to give us a fact, a record citation in terms of what most moves this into willful and malicious? Sure, Your Honor. I'm familiar with the District Court's findings, but I'd be curious to hear when he sort of rhetorically said, well, what's the one that really shows deceit and trickery? What would you point us to? Sure. The deceit and trickery evidence, one, gives the misrepresentations that Tata made to Transamerica, and that's that finding of fact 407, 409, 410, and 412. In those findings, in fact, what the District Court found was that Tata, excuse me, Transamerica, there's too many Ts, Transamerica came and asked Tata, are you using CSC's source code? Are you using CSC's source code and trade secrets to develop? Is this Canfield and Blasek? Yes, also their testimony, but this is actually a letter that was written to Bonnie Eapen, a vice president at TCS, and Transamerica says, are you using CSC's trade secrets to develop banks? Answer, no. Are rebadged employees at all involved in the development of banks? Answer, no. Those were lies as found by the District Court. Second and third piece of evidence with respect to willfulness and maliciousness, Tata bypassed restrictions. This is the SETI email that you were talking about. Mr. SETI tried to send an entire vantage manual that was clearly marked proprietary and confidential. It was blocked by Transamerica's servers, so what did he do? Instead of that, he just took a screenshot of it, took off the proprietary and confidential information ledger, and sent it on. The last piece of evidence, and there's a lot more that goes to willfulness, but you asked for the best. The last piece that's the best is the deceptive practices, and I would cite you to, if you look at an email that is at 54520-22 of the record and findings of fact 380-99, in that email, TCS recognized that offshore resources, meaning people over in India, could not touch CSE's code. They recognized that, so what did they do? They quote unquote, in their own words, got creative and made these duplicate copybooks. Copybooks are source code. They are source code. They made duplicate copybooks that really just made trivial changes and sent it over to the people in India. That's deceptive acts, if I've ever heard of it. Just because there are a few other issues in the case, calculations, source code, necessarily trade secrets, do you have authority for that? This is on the specificity question. Sure, on the specificity question, first and foremost, the law on the circuit clearly under Globe Ranger and under Your Honor's opinion and well logics, is all we have to show is that our technology contains trade secrets, and Mr. Pinto in his very voluminous trial testimony at the Record on Appeal at 13-176-95 described in detail how our source code and our proprietary technical manuals contain trade secrets. Frankly, Your Honors, I think it defies logic to argue that source code is not trade secrets. It's not epitome of trade secrets. It's technical information that is codes. They don't even argue that source code is not trade secrets. That's why they argue, oh, you weren't specific enough. But we were specific enough because we said what contains trade secrets are our source code and our technical manuals. And even beyond that, we went even further and Mr. Pinto testified us to the five functionalities that contained those trade secrets. And then there was a comment about damages. Our damages expert actually apportioned out the damages with respect to those five functionalities. So we were very specific about what were trade secrets, and it certainly satisfies the well logics. Yours was NAPR. Who was theirs? Who was theirs? Bell? Was it Bell? Yes. Barry Bell. Yes. He focused on the same five categories? Yes, he did. If I may, Your Honor, with the last few minutes, I'll turn to remedies. So their argument is that there's double recovery here, and there's no double recovery here for the reason that Judge Wilson eloquently said, and so I don't want to repeat it. Oh, I'd love to hear the eloquence again. But what it is, and it's very simple, is avoided costs, unjust enrichment damages is for a different time period and a different purpose than injunctive relief. Avoided costs is for the past. It's for past misappropriation. It is to require TATA to disgorge its ill-gotten gains. And here— They save $56 million using your trade secrets. They otherwise would have had to have paid it. That's the theory, right? Avoided costs? Yes. But once they've paid that money, why doesn't the version of banks that Transamerica have get to be used? Why would there be an injunction as to that version, even if there's an injunction as to use of trade secrets elsewhere? The one where it's—they've now had to disgorge that money. Yes, sure. So for a number of reasons. The first thing is I start with the statute, and the statute allows for both injunctive relief and unjust enrichment. Second of all— But not for double recovery. No, I agree. I agree. Absolutely, Judge Schoen. I agree with that. So that's the first thing. But the second thing is that it would essentially require—it would be a forced license upon CSC. And CSC, as Judge Wilson noted, CSC has never—and this is in the record—has never granted a license to its trade secrets to a competitor to build a competing product. And so what it would be, it would be a forced license. Forced and imposed upon CSC to allow Tata, someone that did not authorize the use of trade secrets, now they've paid the $56 million, they just get to use their ill-gotten gains and go out. That is a forced—that's a forced— Why isn't that an argument for an injunction only? I'm sorry? Why isn't that an argument for injunction only? Wouldn't an injunction take care of that? No forced license, so we're just going to enjoin you. You can't use it at all. Right. And that's what— In other words, a forced license is don't give us damages, give us an injunction, I  Right. Well, what I'm saying is if they were allowed to pay the $56 million and then there was no injunction, that would be the equivalent of a forced license. But if there is an injunction, why do you have to pay the $56 million? They can't use it. Because they avoided $56 million of costs. And I think here, the old— You're saying, but with the injunction, they—how would they avoid the cost? Are you saying the injunction's not broad enough? That's what I'm not understanding. No, the injunction is forward-looking. The unjust enrichment damages look into the— You're saying they've already captured those gains? Yeah, they've captured $56 million of unjust enrichment damages. And here, I think it's important to consider the old adage of a dollar saved is a dollar earned. Tata today, sitting here today, has $56 million more in their pocket because they misappropriated our trade secrets. Pardon my ignorance. Why does the injunction not require them to do all the work again? To do all the work? Right. It does to the extent that they want to compete in the U.S. market. They have to build the functionality. They have to go back and revert to their 2017— So dollars weren't saved. I'm sorry? So dollars aren't saved. I get your analogy. I'm just trying to make sure it applies here. If they're enjoined from using any of this, then they haven't saved anything. They have to now do everything again. At least that's my premise. Why is that wrong? No, I think you're right. They would have to spend money. But the situation is you don't want to incentivize a trade secret misappropriator to misappropriate trade secrets. And if today, all that this court— Well, that's what exemplary damages are for. I'm still not getting—keep going, sorry. Well, no, I think that also goes to unjust enrichment because it goes to ill-gotten gains. The whole point of unjust enrichment is to make a wrongdoer disgorge their ill-gotten gains. And so let me say here, if the district court had not awarded $56 million in damages and all that the district court had done was enjoined them from future use of our trade secrets, they'd do it every time. Why wouldn't they do it every time? Because they would go to a customer and say, well, I can save $56 million. I might be enjoined in the future if I get caught. A court may tell me I can't do it in the future, but guess what? I'm going to save $56 million. They do it every time. And that's the whole purpose of unjust enrichment damages, is to make a wrongdoer disgorge ill-gotten gains. Quick question. You don't really seem to resist very vigorously, anyway, the non-party issue. The non-party issue. Right. On the scope. I take it it's not a big deal to fix the language on that. We think that it's reviewed under abuse of discretion and that— But why not clarify it just to make sure it meets the statute? All it would require, to the extent that the court finds that there was error there, all it would require would be asking the district court to reform the judgment in line with Rule 56. Anything else? I have a point on Sintel, but I'm well past my time. Well, I would love to hear the point on Sintel. Okay. And we'll add a minute for you, too. Thank you. So— One minute only. Okay. One minute only. So, first and foremost, Sintel does not lead to a different result. And why is that? I would recommend that your honors take a look at pages 797 and 799 of the opinion. And 812. And there, unlike Tata, the court said, quote, Sintel was just a competing services company, not a software company. And also, unlike Tata, quote, Sintel never developed or sold a competing software product using the plaintiff's trade secrets. That's what sets this case apart completely. Sintel also acknowledged that avoided-cost unjust enrichment damages are recoverable as unjust enrichments in appropriate cases. And then specifically cited this court's Globrander opinion where the court said that when a defendant uses your trade secrets to develop a competing product, that necessarily diminishes the value of your trade secrets. And that is how the Motorola case also dealt with Sintel. And so Sintel absolutely does not lead to a different result, nor does it lead to any sort of circuit split here. Thank you, your honors. Mr. Bash? Thank you, Judge Higginson. I want to address three points that were in colloquies with the bench, but just as an initial matter, I think the logic of the court's questions about the $56 million is exactly right. If the injunction makes us return the trade secret, in effect, by wiping out all of our possession of that trade secret, then why do we have to pay — why have we been additionally unjust enriched by the development costs, which are now pointless because we've had to return the whole thing? I think that is the correct answer on that. Three points. There was a colloquy with Judge Ho and Mr. O'Brien about 3A and 3C. Judge Ho, you asked the question whether — is there an implicit limitation in the contract that this is only for the 1990s agreements, basically, activities related to those? That doesn't appear in the contract. They have not really framed their argument in that way. And what I think is key — Is that kind of a commonsensical way of reading the language? Well, I don't think so, especially in light of 3C, Judge Ho. So my colleague made the point that, well, the word other in 3A makes you think it's limited to the sorts of activities that were authorized under the 1990s agreements. And maybe if you were looking at 3A in isolation, you might draw that conclusion. But 3C contains exactly that limitation for other rights, modification, derivative work, and so forth. It says, to the extent permitted by, in brackets, the 1990s agreements. So once you read 3A and 3C in context, I think it's very clear that the parties intended it to limit the way your question suggests for the 3C derivative work, et cetera, rights, not for access and use. Now, you know, access and use is just that. In a different case, if really what had happened is Transamerica had hired someone to make a totally competing platform that could be marketed, I'm sure the party in that case could prove that it's a derivative work, a modified work, and so forth. You'd be under 3C, where it does have the limitation you suggest they couldn't do that. This is access and use. They said you could access and use it when reasonably necessary for services to Transamerica. They did not limit it in any way. And while it's an unusual agreement, it makes sense in context when CSC thought this was commercial ransom. And by the way, that negotiator who we said is a negotiator, the testimony they cite says he probably had to take things back to his higher-ups to get approval. He was clearly very familiar with the negotiations. You can look at the record site and their brief on that. The second point I'd make, and this is a colloquy with Judge Higginson, Mr. O'Brien reeled off like eight findings in the district court's opinion about, well, you use this for banks. None of those findings specifically differentiate whether you're talking about the customer layer of banks or other parts of banks. And I just would make three points on that. One, finding of fact 344 says this information was shared with TCS employees working on the Transamerica version of banks, which not clear exactly what that means, but that tends to mean it's talking about the customer layer. Second, and they don't address this very well in their brief, and they didn't address it at the podium, Section 11.2 of the Master Services Agreement is a confidentiality restriction. And it says that not only Transamerica's information, but any information Transamerica shares with us from a third party that it was under an obligation of confidentiality, just like CSC's information, we cannot share with third parties. So even if they were right we owned it, we couldn't have shared any of the information. If we actually worked in CSC information to the customer layer, and again, their expert did not find anything in the source code that we did that. But if we had actually done that, we'd be under a contractual obligation not to share it with other customers, period, regardless of ownership. And the last point I'll make is, you know, this court owes no deference to the district court's finding of ownership. That's a legal question under these contracts. With limited time, I'm not going to walk through it, because that's a particularly circuitous contractual argument. It's set forth in our briefs. But I think it's very clear that the customer layer is the key developed software under the Master Service Agreements, and that ownership is assigned to Transamerica. The argument is set forth in more detail in our briefs. On willfulness, finally, Judge Higginson, you asked about the evidence of willfulness. Note that most of the exchanges he's talking about are referring to banks generally. You know, I know I can't share this with the banks team and that kind of thing. That could not have referred to the customer layer, because again, I know I'm a broken record on this, but Service Agreement 2 told us it was necessary to access this source code to build the customer layer. I mean, it says that explicitly. And after this litigation is filed in May 2019, Transamerica tells us again, we're specifically authorized, you can use this information to the customer layer. So I think when you're thinking about mens rea and willfulness and reprehensibility for the size of punitive damages, we have a contract saying you must use this source code for this purpose. And you know, stray comments by people that were admittedly not even familiar with the contract, I don't think can impute willfulness to the company when the people in the General Counsel's Office who actually had read the contracts thought this was permissible and were repeatedly assured it was permissible by Transamerica. The last point I would say, one quick one on willfulness, the copybooks episode. You know, as we read the record, this is in the reads of the record, the information was stripped out of the copybooks because they were trying to protect as much confidential information as possible. They were using the copybooks for migration purposes, not to build the customer layer. And they were trying to take out all the information that was not necessary for the migration, so it was limited to the stuff that was necessary to fulfill, in this case, service agreement for. That's our reading of the record. They may contest that. I'm sure they do. But that's the explanation for that. I at least don't think that equates to willfulness, especially in light of all the other points I've made. Just the last point I would make is, even if you find willfulness, there's some level review for the size of punitive damages. The idea that this fact pattern is the maximum punitive damages of reprehensibility where there's no demonstrable harm to CSC, there's no theft, there's no criminal action, it's a debate about the scope of contractual authorizations and whether we should have followed up more with CSC, I don't think this is even remotely in the arena of any punitive damages, let alone maximum 2X award of $110 million. Thank you, Your Honor. Thank you. Superbly argued, briefed. We really appreciate it. That concludes the cases for the day.